## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL WILDLIFE REFUGE ASSOCIATION )
1701 K Street, N.W. )
Suite 550 )
Washington, D.C. 20006, )
  )
FRIENDS OF BLACKWATER )
571 Douglas Rd )
Thomas, WV 26292, )
  )
and )
  )
SIERRA CLUB )
2101 Webster Street )
Suite 1300 )
Oakland, CA 94612 )   Civil Case No. _____
  )
     Plaintiffs, )
v. )
  )
DEB HAALAND, Secretary )
U.S. Department of the Interior )
1849 C Street, N.W. )
Washington, D.C. 20240, )
  )
and )
  )
UNITED STATES FISH AND WILDLIFE SERVICE )
U.S. Department of the Interior )
1849 C Street, N.W. )
Washington, D.C. 20240 )
  )
     Defendants. )
  )
  )
  )
  )

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.     This lawsuit challenges the United States Fish and Wildlife Service's failure to protect wildlife on our National Wildlife Refuge System from the harmful, well-studied, and entirely avoidable impacts of lead poisoning from lead ammunition and tackle. In a troubling portent for its overall approach to this nationwide wildlife scourge, the Service in 2022 withdrew its plan to phase out the use of lead ammunition for hunting at the Canaan Valley National Wildlife Refuge, acceding to the State of West Virginia's unfounded objection. In so doing, the Service abdicated its statutory duty to safeguard wildlife on the Refuge System and granted an unlawful state veto over science-backed conservation policy.

2.     Lead poisoning kills millions of birds and other wildlife each year. Research shows that residual lead ammunition and tackle from hunting and fishing is the primary source of this poisoning. Lead poisoning harms dozens of species, and particularly severe impacts have been documented for certain of them, including waterfowl and the iconic bald eagle, which has seen lead poisoning significantly slow the species' rate of recovery from near-extinction. Eagles are exposed when they scavenge or prey on animals killed or wounded with lead ammunition, ingesting the fine lead fragments scattered in those animals' tissues. People who eat lead-hunted game are exposed that way too, leading to elevated levels of lead in their blood. Thankfully, these are avoidable problems. Non-lead ammunition is widely available, just as effective, avoids harming non-target animals, and produces game meat that is safer for people to eat.

3.     While it will take a far-reaching effort to stem this tide of unnecessary wildlife poisoning, the National Wildlife Refuge System is a logical—and legally appropriate—place to start. The Refuge System is our nation's only collection of lands and waters set aside specifically for conserving wildlife and protecting habitat. As the designated steward of the Refuge System under the National Wildlife Refuge System Improvement Act ("Improvement Act"), the Service

is required to manage the System according to a simple code: wildlife conservation must come first. But though the Service banned lead ammunition in waterfowl hunting nationwide more than three decades ago, it has allowed other hunting and fishing with lead ammunition and tackle—and their associated impacts on wildlife—to continue widely on the Refuge System.

4.      In June 2022, the Service proposed to take a small step toward addressing this problem by phasing out the use of lead ammunition and/or tackle at ten refuges. One of them was the Canaan Valley National Wildlife Refuge in northern West Virginia—home to thousands of acres of unique high-elevation wetlands and a rare northern boreal ecosystem in the central Appalachian region that hosts bald eagles and hundreds of other species. When the Service finalized its proposal three months later, however, it withdrew the plan to phase out hunting with lead ammunition at Canaan Valley. The Service made no attempt to justify its about-face. To the contrary, in support of phasing out lead at the nine other refuges still included in its plan, the Service explained that the scientific evidence brooked no doubt that lead ammunition and tackle causes significant harm to wildlife, including bald eagles. And the Service rebutted concerns that the cost, availability, or effectiveness of non-lead ammunition would dampen hunting participation—concerns that the evidence simply did not bear out. The Service's only explanation for excluding Canaan Valley was that the State of West Virginia had objected—failing to mention that this objection was premised on nearly identical concerns to those the Service had already rebutted.

5.      But the Improvement Act's "wildlife first" code permits no such subversion of conservation to politics. Each National Wildlife Refuge must remain just that—a refuge for wildlife, not a source of poison. The Service violated the Improvement Act when it withdrew its plans to phase out lead ammunition at Canaan Valley. The withdrawal was inconsistent with the

Refuge System's conservation mission and with the mountain of evidence the Service itself marshalled in support of the opposite result. The Court should declare the Service's action unlawful and order it to make a new decision that comports with the evidence and the law.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. §§ 701-706 (the Administrative Procedure Act or "APA"). Defendants' sovereign immunity is waived pursuant to the APA, 5 U.S.C. § 702.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. In particular, upon information and belief, the decision to withdraw the plan to phase out lead ammunition at Canaan Valley was made by officials in Washington, D.C. In addition, the decision was announced and discussed in a final rulemaking document principally authored by a Service official based in Washington, D.C. That same final rulemaking document summarized evidence of nationwide scope and relevance that the Service found to support phasing out lead ammunition and tackle at nine other refuges in various states and should have compelled the Service to reach the same decision for Canaan Valley. Additionally, Plaintiff National Wildlife Refuge Association is headquartered in Washington, D.C.

## PARTIES

8.     Plaintiff National Wildlife Refuge Association ("NWRA") is a Washington D.C.-based non-profit organization dedicated to protecting, enhancing, and expanding the National Wildlife Refuge System—lands set aside by the American people to protect our country's diverse wildlife heritage. By combining policy, grassroots development, and public education objectives, NWRA works to strengthen the ecological integrity of our National Wildlife Refuges and thus to ensure a diverse spectrum of plants and wildlife well into the future.

9.     Plaintiff Friends of Blackwater is a Thomas, West Virginia-based non-profit organization that works to protect and promote natural beauty, diverse creatures, unique heritage, and the outdoor recreation economy in the Mid-Atlantic Allegheny Highlands—home to Canaan Valley and the 10,000-acre Blackwater Canyon. Canaan Valley National Wildlife Refuge includes much of the headwaters of the Blackwater River, which runs through Blackwater Canyon.

10.    Plaintiff Sierra Club is a national non-profit organization dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Headquartered in Oakland, California, the Sierra Club has 67 chapters and more than 808,000 members across the nation.

11.    Plaintiffs bring this action on their own institutional behalfs and on behalf of their members. Plaintiffs' members and staff explore and enjoy recreating in Canaan Valley National Wildlife Refuge (the "Refuge"), using the Refuge for a range of activities, including hunting, hiking, guiding, and nature observation, including bird watching. Plaintiffs' members care about the health, abundance, and diversity of wildlife on the Refuge and in the surrounding area and they have taken concrete steps in service of these values, ranging from choosing to use non-lead ammunition while hunting to initiating a federal government policy to phase out lead ammunition, and from planting trees in the Refuge to fighting to establish Canaan Valley as a National Wildlife Refuge in the first place.

12.    The Service's unlawful action harms Plaintiffs' and their members' interests in viewing healthy wildlife in the Refuge and maintaining a healthy ecosystem. As detailed below, lead poisoning from spent ammunition injures and kills a variety of wildlife, including bald eagles,

4

other raptors, vultures and other scavengers, waterfowl, and upland game birds, all of which are found on the Refuge. Continued hunting with lead ammunition results in additional lead-infused carcasses that poison scavenging animals and additional spent ammunition on the ground and in lake beds that poison waterfowl and upland game birds. Lead ammunition has been shown to have significant, population level impacts on many of these species. The legal violations alleged in this complaint thus cause direct injury to the aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests of Plaintiffs and their members.

13.     For example, Dan Ashe has been a board member of the National Wildlife Refuge Association since 2017. As Chief of the National Wildlife Refuge System from 1998 to 2003, he helped move the Service away from using lead ammunition for management and law enforcement purposes. And as Director of the Service, he issued a Director's order in 2017 that established a policy to phase out lead ammunition and tackle on all land under the Service's jurisdiction by 2022. In his current role as President and CEO of the Association of Zoos and Aquariums, Mr. Ashe works with zoos that rescue and treat lead-poisoned wildlife, including endangered California condors, for whom lead poisoning poses an existential threat. And as a hunter himself, Mr. Ashe uses non-lead ammunition, a practice he views as rooted in the traditions of sportsmanship, while enabling his family to safely eat the game he kills.

14.     Mr. Ashe has a deep, personal tie to Canaan Valley National Wildlife Refuge. His father, a 40-year employee of the Service, was instrumental in the 1994 establishment of the Refuge, and Mr. Ashe joined him both on a visit to the land before it had become a Refuge and again over a decade later for the dedication of the Refuge Visitor's Center, where his father was honored. Mr. Ashe also took annual trips to the Refuge with his family when his children were young to hike and observe wildlife in the Refuge, and visited again during his tenure as Director

of the Service. When visiting the Refuge, Mr. Ashe enjoys hiking and observing wildlife, including bald eagles, and he particularly enjoys observing the mating rituals of snipe, a bird that breeds on the Refuge and is susceptible to lead poisoning from lead ammunition. He believes that the wildlife would be more abundant and diverse, and his experience at the Refuge more rich and rewarding, if lead ammunition were phased out. Mr. Ashe plans to visit the Refuge with his wife in the coming year or two, and plans to introduce his young grandchildren to the Refuge as well. Mr. Ashe is injured by the Service's withdrawal of its plans to phase out lead ammunition on the Refuge, which diminishes his enjoyment of observing wildlife on the Refuge.

15.     Judy Rodd co-founded Friends of Blackwater 23 years ago and currently serves as the organization's Executive Director. She lives in Preston County, West Virginia, has been visiting the Refuge approximately five times a year for the last ten years, and plans to continue doing so in the years to come. On her visits to the Refuge, Ms. Rodd enjoys walking on the trails, seeing butterflies and salamanders, and birdwatching, especially during the spring migration. She enjoys spotting eagles at the Refuge, and while she sees a bald eagle several times a year, she has only seen a golden eagle once. Ms. Rodd knows these species are particularly impacted by lead poisoning and she is disturbed by the needless suffering of animals harmed by lead ammunition. She believes phasing out lead ammunition presents a simple solution that would allow hunting to continue while also protecting wildlife from lead poisoning. Ms. Rodd is injured by the Service's withdrawal of its plans to phase out lead ammunition on the Refuge, which diminishes her enjoyment of observing wildlife on the Refuge.

16.     Linda Cooper, a retired social worker and grant writer, co-founded Friends of Blackwater with Judy Rodd and remains a member to this day. Ms. Cooper grew up in Canaan Valley—the fourth generation of her family to live there. In 1970, she spearheaded and organized

local opposition to a hydropower project that would have destroyed Canaan Valley's unique ecosystem, including its wildlife, and for the next two decades she fought to turn Canaan Valley into a national wildlife refuge.

17.     Ms. Cooper now lives in Anchorage, Alaska, but she maintains a residence on the family farm in Canaan Valley, abutting the Refuge. She stays at that residence every year during April and May and has operated it as a vacation rental the rest of the year, serving visitors attracted to the area's natural beauty and wildlife. Every spring, she visits the Refuge approximately 10 times to hike, birdwatch, identify plants, and watch the green return to the Valley. She enjoys watching and hearing songbirds as well as raptors, including bald eagles, which she frequently sees flying over the Refuge as well as over the family farm. But her enjoyment of the Refuge is diminished by the knowledge that lead ammunition could be causing needless suffering to wildlife for whom the Refuge should be a safe haven, and she is concerned that spent lead ammunition on the Refuge has and will continue to reduce the abundance and health of the wildlife that she and her rental guests see on the Refuge and on her own land. Ms. Cooper is injured by the Service's withdrawal of its plans to phase out lead ammunition on the Refuge, which diminishes her enjoyment of observing wildlife on the Refuge and lessens the appeal of her rental property.

18.     Aaron Graham is a Field Biologist for Friends of Blackwater and lives in Oakland, Maryland. He has been a member of Friends of Blackwater since Fall 2021. Mr. Graham visits the Refuge on a weekly basis—sometimes taking family and friends, or leading tour groups—and plans to continue doing so for the foreseeable future. He is an avid birder and he particularly enjoys birding in the Refuge, where he started birding when he was young. Seeing bald eagles and waterfowl is a large part of what makes the Refuge so unique for Mr. Graham, and he has also seen golden eagles adjacent to the Refuge, which lies within the primary golden eagle wintering

range in the Eastern United States. Mr. Graham grew up going hunting for turkeys and deer with his father, who taught him to use non-lead ammunition to avoid harming other wildlife that might ingest the ammunition. Mr. Graham has seen lead-poisoned eagles in the wild on multiple occasions, and he believes that continued hunting with lead ammunition on the Refuge could cause or contribute to declines, or a slowing of the rebound, of eagle and waterfowl populations in the area. Mr. Graham is injured by the Service's withdrawal of its plans to phase out lead ammunition on the Refuge, which diminishes his enjoyment of observing wildlife on the Refuge.

19.    Frank Gebhard is a Project Coordinator for Friends of Blackwater and lives in Davis, West Virginia. He has been a member of Friends of Blackwater since August 2021. For the last two years, he has visited the Refuge at least three times a year and plans to continue visiting the Refuge on a regular basis going forward, including annual autumn trips to see the fall foliage. Mr. Gebhard enjoys viewing wildlife at the Refuge, especially amphibians and reptiles, and is always excited when he spots a bald eagle. In addition, Mr. Gebhard plans to hunt deer on the Refuge this coming hunting season. Knowing the danger lead ammunition poses to wildlife, Mr. Gebhard hunts with only non-lead ammunition. It angers him that hunting with lead ammunition is still allowed at the Refuge, which he believes should be a sanctuary for the wildlife species that live there, not a minefield of hidden dangers. Mr. Gebhard is injured by the Service's withdrawal of its plans to phase out lead ammunition on the Refuge, which diminishes his enjoyment of observing wildlife and hunting on the Refuge.

20.    Atlee Wise is an Ecological Restoration Manager for Friends of Blackwater and lives in Oakland, Maryland. Mr. Wise has been a member of Friends of Blackwater since the summer of 2022. He has been visiting Canaan Valley National Wildlife Refuge from the time he could walk and was inspired by his time at the Refuge to devote himself to a career in nature. As

an avid birder and naturalist, Mr. Wise visits the Refuge eight to ten times a year. Among other anticipated visits, Mr. Wise plans to visit in fall 2023 to see the bird migration and late-blooming plants. On trips to the Refuge, he especially enjoys spotting marsh birds, bald eagles, and other scavengers, and would love to see a golden eagle. Mr. Wise has hunted in the past and switched to non-lead ammunition when he learned of the dangers lead ammunition poses to wildlife. He is disturbed by the continued use of lead ammunition in the Refuge and is concerned that it will needlessly injure or kill the wildlife that he enjoys observing in and around Canaan Valley. Mr. Wise is injured by the Service's withdrawal of its plans to phase out lead ammunition on the Refuge, which diminishes his enjoyment of observing wildlife on the Refuge.

21.     James Kotcon, Ph.D., has been a Sierra Club member since 1986 and currently serves as Chair of its West Virginia Chapter. Dr. Kotcon moved to Morgantown, West Virginia in September 1985, and still recalls the first time he saw Canaan Valley, shortly thereafter, as one of the most awe-inspiring sights of his life. He attended the Refuge's dedication in 1994 and has been visiting the Refuge a few times a year ever since. On trips to the Refuge, Dr. Kotcon enjoys viewing unique plant and wildlife species, especially raptors. For almost 20 years, and most recently in April 2023, Dr. Kotcon has led volunteer tree planting events at the Refuge. Annually, volunteers plant over 2,000 red spruce trees. In 2008, Dr. Kotcon co-led a team of six volunteers to construct the handicap accessible fishing pier over the Blackwater River in the Refuge. He hopes to lead a Sierra Club outing to the Refuge in fall 2023 and plans to volunteer again at next year's tree planting event. Dr. Kotcon has seen lead poisoned birds up-close at the local avian conservation center and is disturbed by the suffering lead ammunition can inflict on wildlife. He is concerned that the continued use of lead ammunition on the Refuge will harm the raptors and other birds that he enjoys observing on the Refuge and believes that this practice violates the

purpose of a wildlife refuge, especially given the availability of non-toxic ammunition. Dr. Kotcon is injured by the Service's withdrawal of its plans to phase out lead ammunition on the Refuge, which diminishes his enjoyment of observing wildlife on the Refuge.

22.     Plaintiffs' and their members' aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests have been, are being, and, unless their requested relief is granted, will continue to be adversely and irreparably injured by Defendants' failure to comply with federal law. These are actual, concrete injuries that are traceable to Defendants' conduct and would be redressed by the requested relief. Plaintiffs have no adequate remedy at law.

23.     Defendant Deb Haaland is the United States Secretary of the Interior. In that capacity, Defendant Haaland has supervisory responsibility over the United States Fish and Wildlife Service, which issued the unlawful withdrawal decision challenged in this case. Defendant Haaland is sued in her official capacity.

24.     Defendant United States Fish and Wildlife Service is a federal agency within the United States Department of the Interior. The Service is responsible for administering the National Wildlife Refuge System. The Service unlawfully withdrew its plan to phase out lead ammunition at Canaan Valley National Wildlife Refuge by 2026.

## LEGAL BACKGROUND

### I.  The National Wildlife Refuge System Improvement Act

25.     Unique among the nation's public lands, the National Wildlife Refuge System rests upon a single premise—that "[w]ild creatures, like men, must have a place to live." Rachel L. Carson, Chincoteague: A National Wildlife Refuge, U.S. Dep't of the Interior: Conservation in Action 1 (1947), https://digitalmedia.fws.gov/digital/collection/document/id/1244/; *see also* H.R. Rep. No. 105-106, at 1 (1997), as reprinted in 1997 U.S.C.C.A.N. 1798-5 ("The National Wildlife Refuge System is the only system of Federal lands acquired and managed for the conservation of

10

fish, wildlife, plants, and their habitat."). In 1903, President Theodore Roosevelt established the first refuge in an effort to protect the imperiled birds of Florida's Pelican Island. H.R. Rep. No. 105-106, at 1. By century's end, more than 500 refuges had been created across the United States, securing some of the most critical wildlife habitat in the country. *See id.* at 2.

26.     Though consolidated into a single system by the National Wildlife Refuge System Administration Act of 1966, the nation's refuges long lacked a unified purpose. *Id.* at 2-3. "[U]nlike National Parks, National Forests and Bureau of Land Management lands, the National Wildlife Refuge System remain[ed] the only major Federal public lands system without a true 'organic' act, a basic statute providing a mission for the System, policy direction, and management standards for all units of the System." *Id.* at 3.

27.     Congress enacted such a statute in 1997. With the National Wildlife Refuge System Improvement Act ("Improvement Act"), Congress "provide[d] an organic act for the System similar to those which exist for other public lands" and declared that "the conservation of fish, wildlife, plants and their habitats is the mission of the National Wildlife Refuge System." *Id.* at 3-4; *see also* 16 U.S.C. § 668dd(a)(2) ("The mission of the System is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans.").

28.     Under the Improvement Act, the Service, as steward of the nation's refuges, is required to "provide for the conservation of fish, wildlife, and plants, and their habitats within the System"—meaning "to sustain and, where appropriate, restore and enhance, healthy populations of fish, wildlife, and plants." 16 U.S.C. §§ 668dd(a)(4)(A), 668ee(4); *see also* H.R. Rep. No. 105-106, at 10 (noting that the Improvement Act "provides a set of affirmative stewardship

responsibilities for the Secretary with respect to the Refuge System"). The Service must also "ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(4)(B).

29.     In short, "the fundamental mission of our Refuge System is wildlife conservation: wildlife and wildlife conservation must come first." H.R. Rep. No. 105-106, at 9. "[T]he Refuge System should stand as a monument to the science and practice of wildlife management." *Id.* Now including more than 560 refuges spanning 95 million land acres and 760 million acres of submerged lands and waters, the National Wildlife Refuge System is "the world's largest collection of lands and waters set aside specifically for conserving wildlife and protecting ecosystems." U.S. Fish & Wildlife Serv., Canaan Valley National Wildlife Refuge, Comprehensive Conservation Plan 1-5 (2011) ("Comprehensive Conservation Plan"); *see* U.S. Fish & Wildlife Serv., *National Wildlife Refuge System, What we do,*, https://www.fws.gov/program/national-wildlife-refuge-system/what-we-do (last visited July 24, 2023).

30.     Hunting and fishing may be, and often are, allowed on the Refuge System. *See* 16 U.S.C. § 668dd(a)(3)(B); *see also id.* § 668ee(2). But where conflict arises, those uses must always give way to the paramount purpose of the Refuge System—wildlife conservation. Thus, the Service may not authorize hunting or fishing on a refuge unless it is found to be a "compatible use," i.e., one that "will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." 16 U.S.C. §§ 668dd(d)(3)(A)(i), 668ee(1); 50 C.F.R. § 26.41. A use that the Service "reasonably may anticipate" to conflict with the Service's mission to pursue the "biological integrity, diversity, and environmental health" of the Refuge System is

not a compatible use and must not be authorized. 603 FW 2.5(A); *see also* 50 C.F.R. § 26.41.[1]  In

making a compatibility determination for any refuge use, including hunting or fishing, the Service

must consider the direct and indirect impacts of the use over time and cumulatively with other

impacts from both within and outside the refuge. 603 FW 2.11(B)(3); *see also* 50 C.F.R. § 26.41.

It must make that assessment in light of all "available science" and must reach conclusions that

are "consistent with principles of sound fish and wildlife management and administration." 50

C.F.R. § 25.12; *see also* 603 FW 2.11(A), (B).

31.      The Service's obligation to prohibit incompatible refuge uses is an ongoing one. A

compatibility determination must be reevaluated whenever relevant conditions change or "there is

significant new information regarding the effects of the use." 16 U.S.C. § 668dd(d)(3)(B)(vii); *see*

50 C.F.R. § 25.21(f); 603 FW 2.11(H)(1). This duty to reevaluate is triggered whenever "new

information could reasonably be expected to change the outcome of the compatibility

determination." 603 FW 2.11(H)(4). If the Service determines that an existing use is not

compatible, it must "expeditiously terminate or modify the use to make it compatible" within six

months, unless the Director of the Service specially authorizes a longer period. 50 C.F.R. § 26.41;

*see* 603 FW 2.14.

## II.  The Administrative Procedure Act

32.      The APA confers a right of judicial review on any person adversely affected by

final agency action, and provides for a waiver of the federal government's sovereign immunity. 5

U.S.C. §§ 701–06.

---

[1] References in the form 603 FW ___ are to the U.S. Fish and Wildlife Service Manual, Part 603 (" National Wildlife Refuge System Uses"). This Part of the Manual was promulgated through notice-and-comment rulemaking. *See* Final Compatibility Policy Pursuant to the National Wildlife Refuge System Improvement Act of 1997, 65 Fed. Reg. 62484 (Oct. 18, 2000).

33.     Upon review of agency action, the court shall "hold unlawful and set aside action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* § 706(2). An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Further, "the agency must . . . articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quotations and citations omitted)).

## FACTUAL BACKGROUND

### I.   The Effects of Lead Ammunition and Tackle on Wildlife and Human Health

34.     Ingestion of spent lead ammunition has long been known to poison and kill wildlife, with reports in the scientific literature for over a century. An extensive body of evidence now establishes that spent lead ammunition and tackle harms and kills a wide variety of birds and other wildlife, causing especially significant impacts to the populations of certain species, including eagles, condors, loons, swans, and other scavengers, birds of prey, and waterfowl. *See, e.g.*, U.S. Fish & Wildlife Serv., 2022–2023 Station-Specific Hunting and Sport Fishing Regulations, 87 Fed. Reg. 57108, 57111-13, 57116-17 (Sept. 16, 2022) ("Final Rule").[2] Research also shows that

_____

[2] *See also e.g.* National Park Service, *Lead and Wildlife*, Pinnacles National Park, https://www.nps.gov/pinn/learn/nature/leadwildlife.htm (last visited July 24, 2023); Deborah J. Pain, et al., *Effects of lead from ammunition on birds and other wildlife: A review and update*, 48 Ambio 935–953 (2019), https://doi.org/10.1007/s13280-019-01159-0 ("Pain (2019)"); Susan M. Haig, et al., *The persistent problem of lead poisoning in birds from ammunition and fishing tackle*, 116 The Condor 408-428 (2014), https://doi.org/10.1650/CONDOR-14-36.1 ("Haig

people who eat game hunted with lead ammunition experience increased lead levels in their bodies. *Id.* at 57111.

35.     While lead poisoning can kill birds immediately, it also causes lasting, potentially fatal damage even when not immediately lethal. Lead poisoning causes symptoms such as anemia, lethargy, diarrhea, muscle wastage, loss of fat reserves, wing droop, loss of balance and coordination, and other neurological problems such as leg paralysis or convulsions. *See* Pain (2019). Birds weakened by lead poisoning are more susceptible to death from other causes, such as infectious diseases, parasites, collisions with power lines, inability to hunt, and being shot. *Id.*; *see also* Draft Hunting Plan, Appendix A, "Compatibility Determination," at A-8. Lead ammunition likely represents the largest source of unregulated lead in the environment. *See* 2013 Consensus Statement. Although it is impossible to precisely calculate, scientists estimate that millions of birds are killed by lead poisoning each year.[3]

36.     Lead in ammunition and tackle poisons wildlife in various way. Eagles, condors, and other birds of prey and scavengers are exposed to lead poisoning when they eat the carcasses and gut piles of animals hunted with lead ammunition. *See* Final Rule at 57113. X-rays of animals hunted with lead ammunition show fine fragments of lead embedded in the animals' meat and other tissues. *Id.*; *see also* National Park Serv., *Lead Bullet Risks for Wildlife & Humans*, Pinnacles

---

(2014)"); Molly A. Tranel and Richard O. Kimmel, Impacts Of Lead Ammunition On Wildlife, The Environment, And Human Health – A Literature Review And Implications For Minnesota, Minnesota Department of Natural Resources, Farmland Wildlife Population and Research Group (2009); David Bellinger, et. al., *Health Risks from Lead-Based Ammunition in the Environment - A Consensus Statement of Scientists* (2013), https://www.biologicaldiversity.org/campaigns/get_the_lead_out/pdfs/Scientists_Heatlh_Impacts _letter_3-13.pdf ("2013 Consensus Statement").

[3] *See* Pain (2019); John H. Schulz, et al., *Will Mourning Dove Crippling Rates Increase With Nontoxic-Shot Regulations?,* 34 Wildlife Society Bulletin 861-865 (2006).

National Park, https://www.nps.gov/pinn/learn/nature/leadinfo.htm (last visited July 24, 2023).
When birds of prey and scavengers ingest these lead fragments, it enters their digestive tracts and
bloodstreams, leading to injury and death. Final Rule at 57113. Birds of prey and scavengers are
also exposed to lead by eating animals that have been wounded but not immediately killed by lead
ammunition, or that have accumulated lead in their tissues or blood from ingestion. *Id.* at 57111.

37.     Waterfowl are exposed to lead when they accidentally swallow lead sinkers and
spent lead ammunition resting on river and lake bottoms alongside the pebbles that they
intentionally swallow for use in breaking down food in their digestive systems. *Id.* at 57113. The
grinding action within their digestive systems breaks down the lead into fine particles that enter
the birds' bloodstreams. *Id.* The same pathway leads to lead poisoning of upland game birds, which
ingest lead ammunition discarded on land alongside the pebbles they too swallow to aid digestion.
*Id.*

38.     This poisoning of wildlife by lead ammunition and tackle does not merely impact
the occasional animal.  It has significant impacts on species. For example, a recent, peer-reviewed
study, co-authored by scientists from the Service and the United States Geological Survey, found
that nearly half of all the dead bald and golden eagles sampled nationwide had lead levels
indicating chronic lead poisoning, and more than a quarter of live bald eagles sampled had
evidence of acute lead poisoning. *See* Vincent A. Slabe, *et al.*, *Demographic implications of lead
poisoning for eagles across North America*, 375 Science 779–782 (2022) ("Slabe (2022)").[4] The
rate of acute lead poisoning was significantly higher during the hunting season, indicating a causal
connection with lead ammunition. *Id.* at 780. The study also found that this amount of lead

_____

[4] Samples were collected from 38 states across the country, including West Virginia, from 2010
through 2018, during all seasons of the year. *See* Slabe (2022).

poisoning was sufficient to slow population growth rates for bald and golden eagles to a statistically significant degree. *Id.* at 779-81; *see also* Final Rule at 57113, 57117 (citing Slabe (2022)). Other studies have shown that ingested lead is a leading cause of mortality in adult common loons and trumpeter swans. Final Rule at 57113. And evidence demonstrating that poisoning from lead ammunition was impairing the recovery of endangered California condors caused the State of California in 2019 to ban hunting with lead ammunition statewide. *See id.* at 57113; Pain (2019) at 946-47; *cf.* Haig (2014) at 414.

39.     Hunting with lead ammunition also harms people. Studies "have found the ingestion of animals harvested via the use of lead ammunition increased levels of lead in the human body"—a clear danger given the harmful impacts of lead on human health. Final Rule at 57111; *see* 2013 Consensus Statement.

## II.  The Canaan Valley National Wildlife Refuge

40.     Designated in 1994 as the nation's 500th national wildlife refuge, the Canaan Valley National Wildlife Refuge was established "to insure the ecological integrity of Canaan Valley and the continued availability of its wetland, botanical, and wildlife resources to the citizens of the United States." Comprehensive Conservation Plan at 4-17 (quoting U.S. Fish and Wildlife Serv., Final Environmental Impact Statement – Acquisition of lands for the Canaan Valley National Wildlife Refuge, West Virginia (1979)); *see also id.* at 1-15, B-25. In addition, the Refuge was established:   (1) "for the development, advancement, management, conservation, and protection of fish and wildlife resources," pursuant to the Fish and Wildlife Act of 1956, 16 U.S.C. 742f(a)(4); (2) for "the conservation of the wetlands of the Nation in order to maintain the public benefits they provide and to help fulfill international obligations contained in various migratory bird treaties and conventions," pursuant to the Emergency Wetlands Resources Act of 1986, 16 U.S.C. 3901(b); and (3) "for use as an inviolate sanctuary, or for any other management purpose,

for migratory birds," pursuant to the Migratory Bird Conservation Act of 1929, 16 U.S.C. § 715d. *See* Comprehensive Conservation Plan at 1-16.

41.     The Refuge sits 3,200 feet above sea level in the Allegheny Mountains in Tucker and Grant Counties, West Virginia. Its approximately 17,000 acres include 5,573 acres of high-elevation wetlands, which form the major part of the nationally important Canaan Valley wetland complex—the largest contiguous wetland complex in the central and southern Appalachian Mountains. Comprehensive Conservation Plan at 1-3, 1-15, 4-17; U.S. Fish & Wildlife Serv., Canaan Valley National Wildlife Refuge, Recreational Fishing Plan 2 (2020) ("Fishing Plan"). Due to its natural beauty and rare northern boreal ecosystem, the broader Canaan Valley, in which the Refuge is located, was designated a National Natural Landmark in 1974. *See* Comprehensive Conservation Plan at 3-16; Canaan Valley Task Force, *Canaan Valley: A National Treasure* 3-4 (1992).

42.     The Refuge's forest, meadow, riparian, and wetland habitats support at least 583 plant species and 286 species of fishes, amphibians, reptiles, mammals and birds. Comprehensive Conservation Plan at 3-27, 3-30. The Refuge provides "an important contiguous wetland habitat for breeding and migratory waterfowl" as well as for herons, shorebirds, American woodcock, and Wilson's snipe. *Id.* at 3-30, H-2. In addition, many raptor species use the Refuge. "[B]ald eagles . . . are common during fall and winter months and golden eagles . . . have been seen during migration" on the Refuge. *Id.* at 3-32, H-2. Turkey vultures, red-shouldered hawks, broad-winged hawks, Cooper's hawks, and sharp-shinned hawks all breed on the Refuge, and rough-legged hawks hunt on the Refuge during winter. *Id.* at 3-32.

43.     As a result of its natural beauty and diverse wildlife, the Refuge hosts more than 73,000 recreational visits each year for a variety of purposes, including wildlife observation,

environmental education, hiking, biking, hunting, and fishing. *See* U.S. Fish & Wildlife Serv., Canaan Valley National Wildlife Refuge, Hunting Plan-Draft A-8 (May 2022) ("Draft Hunting Plan"); U.S. Fish & Wildlife Serv., Division of Economics, The Economic Contributions of Recreational Visitation at Canaan Valley National Wildlife Refuge 2 (2019) ("Economic Contributions"). Approximately 2,300-2,700 of those annual visits are for hunting, which is allowed on 97% of the Refuge during hunting season (primarily September through February). Economic Contributions at 2; Draft Hunting Plan at 3, A-8, B-6. Hunting with lead ammunition is permitted on the Refuge for all species except waterfowl. Draft Hunting Plan at A-8; 50 C.F.R. §§ 20.21(j), 20.108, 32.67(a). Fishing with lead sinkers is prohibited in the Refuge's freshwater ponds but is allowed in other fishing areas on the Refuge. Fishing Plan at 5; 50 C.F.R. § 32.67(a)(4).

### III. The Service's Prior Attempts to Regulate Lead Ammunition and Tackle and its 2022 Proposal to Phase Out Lead Ammunition and Tackle at Ten Refuges

44.    In 1991, the Service implemented a nationwide ban on the use of lead ammunition for hunting waterfowl and coots. 50 C.F.R. §§ 20.21(j); 20.108; Migratory Bird Hunting: Nationwide Requirement To Use Nontoxic Shot for the Taking of Waterfowl, Coots, and Certain Other Species Beginning in the 1991-92 Hunting Season, 56 Fed. Reg. 22100 (May 13, 1991). The Service grounded that ban on its "determination that lead poisoning resulting from waterfowl hunting is a significant annual mortality factor in certain migratory birds." 56 Fed. Reg. at 22100.

45.    Despite banning lead ammunition for waterfowl hunting nationwide in 1991, the Service continued to allow the use of lead ammunition for other types of hunting and lead tackle for fishing, including on national wildlife refuges. The Service's efforts to address the ongoing harms associated with such lead use in the Refuge System have been ineffectual or insufficient and too often subject to unwarranted reversals.

46.     In a January 2017 Director's Order, the Service established a policy to phase out lead ammunition and tackle on all land under the Service's jurisdiction, including the Refuge System, by 2022. *See* Daniel M. Ashe, Use of Nontoxic Ammunition and Fishing Tackle, Order No. 219, U.S. Fish and Wildlife Serv. (Jan. 19, 2017), bit.ly/3YrNfzE. In support of the policy, the Service found that the "[e]xposure to lead ammunition and fishing tackle has resulted in harmful effects to . . . wildlife" and that hunting with lead ammunition poses "an ongoing risk to upland or terrestrial migratory birds and other species that ingest spent shot directly from the ground or as a result of predating or scavenging carcasses that have been killed with lead ammunition and left in the field." *Id.* at 1. In March 2017, however, after a change in presidential administration, the Department of the Interior revoked the January 2017 Order. *See* Ryan Zinke, Revocation of the United States Fish and Wildlife service Director's Order No. 219 (Use of Nontoxic Ammunition and Fishing Tackle), Order No. 3346, U.S. Dep't of the Interior (March 2, 2017), bit.ly/41UJvt4.

47.     Following that reversal, the Service attempted a new, more incremental approach. In June 2022, as part of its annual review of sport hunting and fishing programs on the Refuge System, the Service issued its proposed "2022–2023 Station-Specific Hunting and Sport Fishing Regulations," 87 Fed. Reg. 35136 (June 9, 2022) ("Proposed Rule"). Explaining that "the best available science, analyzed as part of this proposed rulemaking, indicates that lead ammunition and tackle may have negative impacts on both wildlife and human health," the Service announced that it was proposing to phase out the use of lead ammunition and tackle by fall 2026 at ten refuges: Patoka River, Blackwater, Chincoteague, Eastern Neck, Erie, Great Thicket, Patuxent Research Refuge, Rachel Carson, Wallops Island, and Canaan Valley. *Id.* at 35138.[5]

---

[5] At the same time, the Service also proposed to open new areas of these ten refuges to hunting and/or fishing.

48.     In connection with the Service's June 2022 proposal to phase out lead

ammunition at ten refuges, including Canaan Valley, the Service issued a Draft Hunting Plan, a

Compatibility Determination, and an Environmental Assessment for Canaan Valley, all of which

incorporated, analyzed, and relied on the plan to phase out lead ammunition at the Refuge by

2026.

49.     Under the Draft Hunting Plan, an additional 441 acres of existing Refuge land

plus approximately 2,000 acres of private land within the approved Refuge acquisition boundary

would be opened to hunting in the future if the private land was acquired by the Service.[6] Draft

Hunting Plan at 3-4. In addition, the Draft Hunting Plan specified that "the refuge will phase out

use of lead ammunition for hunting all species by 2026. Hunters would be encouraged to use

non-lead ammunition voluntarily until 2026." *Id.* at 2.

50.     The Service's Compatibility Determination for the Refuge hunting program noted

that the "negative impacts of lead on wildlife are documented and clear." Compatibility

Determination at A-7. The Service explained that "[e]agles and other scavengers can be

susceptible to lead poisoning when they ingest lead fragments or pellets in the tissues of animals

killed or wounded by lead ammunition" and that "[l]ead poison may weaken raptors and increase

mortality rate by leaving them unable to hunt, or more susceptible to vehicles or power line

accidents." Compatibility Determination at A-8. As a result, the Service concluded that hunting

on the Refuge was compatible with the Refuge's purposes only if "[n]on-lead ammunition will

---

[6] The 441 acres of existing Refuge land to be opened to hunting in the future are currently
inaccessible to the public because they are surrounded by private property.

be required for hunting all species beginning in fall of 2026." *Id.* at A-9. The Service deemed

this condition, among others, to be "necessary to ensure compatibility." *Id.*

51.     The Service's Environmental Assessment of the Refuge hunting program

included the same description of the susceptibility of eagles and other raptors and scavengers to

lead poisoning and resultant injury and mortality from ingesting lead ammunition. Draft Hunting

Plan, Appendix B, "Environmental Assessment," at B-5, B-14-15. The Service also cited a study

of bald and golden eagles admitted to a raptor rehabilitation program in the state of Washington

over 17 years, which "found that 48 percent of bald eagles and 62 percent of golden eagles tested

had blood lead levels considered toxic by current standards" and that, "[o]f the bald and golden

eagles with toxic lead levels, 91 percent of bald eagles and 58 percent of golden eagles were

admitted to the rehabilitation facility after the end of the general deer and elk hunting seasons."

*Id.* at B-5. The Service added that "[t]he requirement of non-lead ammunition on the refuge after

fall 2026 will help address concerns about the bioavailability of lead on the refuge." *Id.*

### IV. The Service's Findings Detailing the Strong Scientific Basis for Phasing out Lead Ammunition and Tackle on Refuges

52.     In September 2022, the Service issued its final "2022–2023 Station-Specific

Hunting and Sport Fishing Regulations." 87 Fed. Reg. 57108 (Sept. 16, 2022) ("Final Rule").

During the 60-day comment period on the Proposed Rule, the Service had received more than

47,000 comments pertaining to the Service's plan to phase out lead ammunition and tackle at the

ten specified refuges. In response to these comments—over 30,000 of which supported the lead

phaseouts—the Service explained in detail the strong scientific basis for phasing out lead

ammunition and tackle on national wildlife refuges.

53.     Reiterating its conclusion from the Proposed Rule, the Service found that the "best

available science, analyzed as part of this rulemaking, demonstrates that lead ammunition and

tackle have negative impacts on both human health and wildlife, and those impacts are more acute for some species." *Id.* at 57112, 57119, 57122. The Service explained that its use of the term "may" in its similar statement in the Proposed Rule ("may have negative impacts") was *not* intended to connote any uncertainty in the scientific literature but rather that "using lead ammunition or tackle can and does have these negative impacts on certain wildlife species and humans, even if an individual bullet or sinker may or may not contribute to lead poisoning in a particular wild animal or human." *Id.* at 57119. But to avoid any misunderstanding and appropriately convey the certainty with which the scientific literature supports the conclusion of harmful impacts to wildlife and humans, the Service decided to remove the word "may" from its statement about the "best available science." *Id.*

54.    The Service noted that it had instituted a nationwide ban on the use of lead shot for waterfowl hunting in 1991 due to "high bird mortality" and the science showing that "the principal cause of lead poisoning in waterfowl was the high densities of lead shot in wetland sediments associated with migratory bird hunting activities." *Id.* at 57111. The 1991 ban, however, did not fully address the harms to wildlife and human health from spent lead ammunition and tackle because they continued to be used for fishing and other forms of hunting. The Service explained, as described above, that the evidence shows that lead ammunition and tackle continue to harm wildlife, including birds of prey and scavengers that eat carcasses and gut piles studded with fragments of lead ammunition, and waterfowl and upland game species that ingest lead shot and tackle alongside pebbles and then grind it down in their specialized digestive tracts, causing lead to enter the bloodstream. *Id.* at 57113.

55.    In response to comments questioning the sufficiency of the scientific evidence supporting the proposed requirements to use non-lead ammunition and tackle on the specified

refuges, the Service explained that it had "considered peer-reviewed scientific studies evaluating the impacts of lead to humans, to wildlife generally, and to specific species—including endangered and threatened species and species especially susceptible to lead ammunition or tackle exposure." *Id.* at 57112.  The Service also "reject[ed] the related claim that scientific evidence of so-called 'population-level' impacts to wildlife is both a prerequisite to Service action and lacking in the available science." *Id.* at 57113. The Service first explained that it need not wait for "population level impacts" in order to take action; rather, it may, and often must, act earlier to prevent a threat from achieving that level of harm. *Id.* But the Service also noted that "the scientific literature demonstrates that lead use has 'population-level' impacts." *Id*. (emphasis added).

56.     For example, the Service cited numerous studies that examined the impacts of lead poisoning on eagles, including the 2022 study described above, in which the Service together with the United States Geological Survey found that lead poisoning corresponding with hunting activities "is causing population growth rates to slow for bald eagles by 3.8% and golden eagles by 0.8% annually," with both effects statistically significant. *Id.* The Service also cited "evidence of population-level impacts and potential population-level impacts to waterfowl and upland game bird species." *Id.* As noted above, the Service explained that "studies have consistently found" ingestion of lead tackle to be "a leading cause of mortality in adult common loons." *Id.* The Service also cited a study in which "25 percent of the trumpeter swan fatalities from 1991 to 2007 were attributed to ingested lead." *Id.* The Service noted that the same mechanism presents a "similar risk of lead poisoning" to upland game birds. *Id.* The Service also pointed out that "population-level" impacts to waterfowl and California condors had respectively led to the Service's 1991 nationwide ban on lead ammunition for waterfowl hunting and California's statewide ban on all hunting with lead ammunition. *Id.*

24

57.     The Service refuted comments claiming that the price or availability of non-lead ammunition and tackle will reduce participation in hunting and fishing on refuges. To the contrary, the Service found that, while non-lead ammunition is more expensive than some lead ammunition (though comparable to premium lead ammunition), the difference in price will not meaningfully impact participation in hunting and fishing. *Id.* at 57114. The Service also found that non-lead ammunition was sufficiently available. *Id.* The Service noted it had not seen declines in hunting and fishing attributable to non-lead requirements at any of the other refuge areas where lead use has been restricted in the past. The Service also noted that the price of non-lead ammunition has been continuously decreasing and its availability increasing, suggesting that non-lead requirements such as the 1991 nationwide ban on lead use in waterfowl hunting can spur innovation, increase availability, and lower prices. Further, the Service noted that it was considering non-lead ammunition and tackle giveaway and exchange programs to ease the transition, especially programs targeted toward low-income and subsistence hunters. *Id.*

58.     Likewise, the Service refuted comments claiming that non-lead ammunition performs less effectively. *Id.* at 57115. The Service explained that its own experience using non-lead ammunition for management purposes since 2016 was confirmed by unanimous scientific evidence that non-lead ammunition performs just as well as lead ammunition. *Id.* With regard to comments suggesting that a voluntary approach should be used instead of imposing non-lead requirements, the Service noted that "years of efforts toward educating hunters and encouraging non-lead use by the Service and other organizations have not yielded significant uptake of non-lead ammunition and tackle, despite some localized success stories." *Id.* at 57115-16.

59.     The Service found unpersuasive comments opposing the lead phase-outs because there are other sources of lead on refuges or because lead ammunition is permitted elsewhere. The

25

Service explained that "these potential sources do not change the fact that the best available science has drawn a clear link between the use of lead ammunition and tackle and its ecological health impacts," noting for example that the recent study on eagles by the Service and the United States Geological Survey provided evidence that lead ammunition was likely the most significant source of lead poisoning in eagles. *Id.* at 57116-17. The Service further explained that the existence of other sources of lead only heightened the need for non-lead requirements on refuges, as lead can accumulate in wildlife from various sources. *Id.* at 57117. And with regard to off-refuge use of lead ammunition, the Service reiterated that actions beyond refuge borders do not excuse the Service from pursuing its conservation mission within the Refuge System itself. *Id.*

60.     Finally, in response to comments claiming that non-lead ammunition requirements would infringe Second Amendment rights, the Service explained that "the non-lead requirements contemplated in this rule actually expand, rather than restrict, the use of firearms for members of the public because the appropriate alternative to non-lead ammunition when and where we determine the need to phase-out lead is not the use of lead ammunition but the potential closure of hunting opportunities that are not compatible." *Id.* at 57118.

## V.   The Service's Decision to Withdraw Its Plan to Phase Out Lead Ammunition at Canaan Valley

61.     Supported by the extensive evidence summarized above, the Service determined in the Final Rule to move forward with its plans to phase out lead ammunition and/or tackle at nine of the ten refuges specified in the Proposed Rule. *Id.* at 57108. Canaan Valley, however, was not one of them.

62.     Instead, the Service announced in the Final Rule's preamble that it had decided to withdraw its plan to promulgate a rule phasing out lead ammunition at Canaan Valley by 2026 and to simultaneously withdraw the Draft Hunting Plan and compatibility determination requiring such

a phase-out (the "Withdrawal Decision"). *Id.* at 57111. The Service provided no explanation for this decision other than that the West Virginia Department of Wildlife Resources "expressed concern about the requirements to use non-lead ammunition under consideration for Canaan Valley NWR" and had requested the proposal be withdrawn. *Id.* at 57110; *see id.* at 57111 ("In response to the West Virginia Department of Wildlife Resources' request," the Service wrote, "we have withdrawn all of the proposed changes for hunting and fishing at Canaan Valley NWR.").

63.     The Service did not specify what the State of West Virginia's concerns were, or whether the Service found them persuasive. An examination of the State's June 30, 2022 comment letter, however, reveals that the State's concerns were refuted by the Service's responses to other comments in the Final Rule. *See* Letter from Paul Johnson, Chief, Wildlife Res. Section, West Virginia Dep't of Nat. Res., to Scott Kahan, Northeast Reg'l Chief, Nat'l Wildlife Refuge System, U.S. Fish and Wildlife Serv. (June 30, 2022) ("West Virginia Letter"). Specifically:

    a)  West Virginia contended that "non-lead ammunition is often unavailable and far more expensive than lead ammunition" and that "non-lead ammunition may be incompatible with some firearms." *Id.* at 1. It argued that these factors would lead to a "[r]eduction in hunter participation" which "would likely result in a decrease in the number of deer harvested on the refuge" and which, in turn, would have adverse environmental effects. *Id.* at 1-2. But, as noted above, the Service rebutted virtually identical comments claiming that price, availability, or compatibility issues would reduce hunter participation, finding such claims to be contradicted by the available evidence. Final Rule at 57114-15.

    b)  West Virginia claimed that enforcement of a lead phase-out would be difficult, but the Service rebutted concerns about enforceability in response to similar comments.

West Virginia Letter at 2; Final Rule at 57116 ("[W]e have determined that we have the law enforcement capacity to administer the hunting in this rulemaking under non-lead requirements.").

c)   West Virginia also claimed that the lead phase-out was not justified because the Draft Hunting Plan purportedly "fail[ed] to document impacts from lead ammunition specifically at [Canaan Valley] or another similarly situated refuges [sic]." West Virginia Letter at 2. But as the Final Rule makes clear, the Service found the overwhelming scientific evidence of the harmful impacts of lead ammunition and tackle on wildlife and human health to be compelling, regardless of whether any studies were performed at the specific refuges at which lead was being phased out. Moreover, the Final Rule cited evidence of harmful impacts to eagles, other birds of prey, scavengers, waterfowl, and upland game birds, all of which are found at Canaan Valley. In this regard, West Virginia offered no basis to conclude that the impacts of lead ammunition documented widely across the nation would not also be present at Canaan Valley.

64.    In sum, the West Virginia Department of Natural Resources identified no concern that the Service had not extensively addressed and rejected in concluding that the best available scientific information and the Service's own refuge-management obligations supported a lead phase out on refuge lands. Instead, with respect to Canaan Valley, the Service ignored the conclusion that was compelled by the evidence before it and instead withdrew its plans to phase out lead ammunition simply because the State of West Virginia asked. In so doing, the Service undermined its own choice to pursue an incremental, refuge-by-refuge response to the problem of lead ammunition and tackle in the National Wildlife Refuge System, and provided a blueprint for

other state agencies to exempt refuges within their borders from that response simply by raising an unjustified objection.

65.     In June 2023, the Service published its Proposed 2023-24 Station-Specific Hunting and Sport Fishing Regulations. 88 Fed. Reg. 41058 (June 23, 2023). Consistent with the decision announced in its 2022 Final Rule, the Service did not propose to phase out lead ammunition at Canaan Valley National Wildlife Refuge.

## CAUSE OF ACTION
### (Violation of the Improvement Act)

66.     All preceding paragraphs are hereby incorporated as if fully set forth herein.

67.     Under the Improvement Act, the Service may not authorize hunting or fishing on a refuge unless it is found to be a "compatible use," i.e. that it "will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." 16 U.S.C. § 668dd(d)(3)(A)(i); 16 U.S.C. § 668ee(1); 50 C.F.R. § 26.41. Congress has declared that "the fundamental mission of our Refuge System is wildlife conservation: wildlife and wildlife conservation must come first." H.R. Rep. No. 105-106, at 9; *see* 16 U.S.C. § 668dd(a)(2) (the mission of the Refuge System is to "administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans"). Likewise, the purpose of the Canaan Valley National Wildlife Refuge is "to insure the ecological integrity of Canaan Valley and the continued availability of its wetland, botanical, and wildlife resources to the citizens of the United States." Comprehensive Conservation Plan at 4-17.

68.     Here, the Service concluded that "the best available science . . . demonstrates that lead ammunition and tackle have negative impacts on both human health and wildlife, and those

impacts are more acute for some species." Final Rule at 57112, 57119, 57122. It cited scientific evidence that bald eagles, other birds of prey, scavengers, waterfowl, and upland game species are significantly harmed by lead poisoning from spent lead ammunition, and it described the mechanisms by which this harm occurs. *Id*. at 57111-13. The Service acknowledged that all of these species use the Refuge, including bald eagles which "are common during fall and winter months" (i.e. hunting season). Comprehensive Conservation Plan at 3-30, 3-32, H-2. And the Service issued a Compatibility Determination finding that phasing out lead ammunition at Canaan Valley by 2026 is *necessary* to ensure that hunting on the Refuge is compatible with the wildlife conservation purposes of the Refuge and of the Refuge System. Compatibility Determination at A-9.

69.    As steward of the Refuge System, the Service's statutory obligation to put wildlife conservation first required it to make a decision regarding hunting at Canaan Valley that was consistent with the science and avoided unnecessary harm to wildlife and wildlife habitat. But by withdrawing its plan to promulgate a rule phasing out lead ammunition at Canaan Valley and simultaneously withdrawing its compatibility determination requiring such a phase-out, the Service did the exact opposite. In violation of the Improvement Act, the Service chose to allow hunting with lead ammunition to continue, without any plan or commitment to phase it out, despite clear evidence that this unnecessarily toxic use of the Refuge causes significant harm to wildlife, poisons their habitat, and is incompatible with the conservation mission of the Refuge System.

70.    Further, by making that decision without any reasoned explanation for its sudden about-face, the Service failed to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quotations and citations omitted). And to the extent the Service based this decision on

the State of West Virginia's unsupported objection, the Service "relied on factors which Congress has not intended it to consider" and "offered an explanation for its decision that runs counter to the evidence before the agency." *Id.*

71.     Accordingly, the FWS's decision to withdraw its plan to promulgate a rule phasing out lead ammunition at Canaan Valley by 2026 and to simultaneously withdraw its compatibility determination requiring such a phase-out is arbitrary, capricious, and contrary to law in violation of the Improvement Act.

## REQUEST FOR RELIEF

THEREFORE, Plaintiffs respectfully request that this Court:

1.     Declare that the Service acted arbitrarily and capriciously and violated the Improvement Act by withdrawing its plan to promulgate a rule phasing out lead ammunition at Canaan Valley by 2026 and simultaneously withdrawing its compatibility determination requiring such a phase-out (the "Withdrawal Decision");

2.     Set aside and remand the Service's Withdrawal Decision and order the Service to make a new decision consistent with the Improvement Act;

3.     Award Plaintiffs temporary, preliminary, and/or permanent injunctive relief as necessary to remedy the Service's unlawful action.

4.     Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, associated with this litigation; and

5.     Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

DATED this 31st day of July, 2023.

/s/ Timothy J. Preso
Timothy J. Preso (D.C. Bar No. 456531)
Earthjustice
313 East Main Street, PO Box 4743
Bozeman, MT 59715-4743
tpreso@earthjustice.org
Phone: (406) 586-9699
Fax: (406) 586-9695

Aaron M. Bloom (New York Bar No. 4247714)
*(pro hac vice pending)*
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
abloom@earthjustice.org
Phone: (917) 410-8727
Fax:    (212) 918-1556

*Attorneys for Plaintiffs*